1

2

3

4

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    DAVID PATRICK ALFORD,                    No. 2:16-CV-01305-KJM-DMC

12                 Plaintiff,

13           v.                                FINDINGS AND RECOMMENDATIONS

14    SCHUMACHER, et. al,

15                 Defendants.

16

17           Plaintiff, a prisoner proceeding pro se, brings this civil rights action under 42 U.S.C.

18    § 1983. Pending before the Court are Defendants' motion for summary judgment and Plaintiff's

19    opposition. ECF Nos. 49, 64. The undersigned United States Magistrate Judge recommends

20    granting Defendants' motion.

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

1

## I. PLAINTIFF'S ALLEGATIONS

2          Plaintiff, David Patrick Alford, is an inmate at Mule Creek State Prison (MCSP).

3   Plaintiff names the following defendants: (1) Schumacher,[1] Licensed Vocational Nurse (LVN) at

4   MCSP, (2) Dr. Robert Rudas, Physician/Surgeon at MCSP, and (3) Dr. Evalyn Horowitz. In his

5   operative first amended complaint, Plaintiff alleges that Defendants Schumacher and Rudas

6   violated his Eighth Amendment rights by failing to treat his infection before it required surgery.

7   ECF No. 20 at 5. Plaintiff also alleges that Defendant Horowitz violated his Eighth Amendment

8   right by reducing his pain medication to levels that left him in severe pain. Id. at 7.

9          Specifically, Plaintiff contends that Dr. Rudas delayed treating an abscess on

10  Plaintiff's chest for several months. Id. at 5. An abscess developed on Plaintiff's chest after he

11  underwent open-heart surgery in August 2013. Id. The abscess first formed in April 2013, but Dr.

12  Rudas did consider until around July 2014 (ostensibly Plaintiff's first meeting with Dr. Rudas) that

13  Plaintiff had sternal osteomyelitis. Id. Plaintiff told Dr. Rudas that he had had a recurring infection

14  in his chest. Id. at 5–6. Dr. Rudas sent Plaintiff to the hospital for consult in August 2015. Plaintiff

15  contends that, as a result of Dr. Rudas' delay in treating Plaintiff, he contracted osteomyelitis that

16  required several procedures to correct, including removal of sixty percent of his sternum. Id.

17         Similarly, Plaintiff asserts that he complained of the chest abscess sometime in April

18  2014. Id. at 9. Medical staff had ostensibly treated and bandaged the wound. See id. The next month,

19  in May, the abscess opened and began draining blood and pus. Id. Plaintiff went to MCSP's medical

20  clinic for emergency treatment. Id. Nurse Schumacher refused to treat Plaintiff or give him

21  bandages. Id. She allegedly told him to "get out," would not issue a work order or examine him and

22  told him to fill out a healthcare request. Id. Schumacher, another month later in June, allegedly

23  refused to examine Plaintiff again when his chest abscess opened. Id. He contends that

24  Schumacher's actions contributed to his development of osteomyelitis of the sternal bone. Id. The

25  resulting osteomyelitis required multiple procedures, including a muscle flap procedure, two

26  sternotomies, and a sternectomy to remove sixty percent of the sternum. Id.

27

28
[1] Plaintiff spells Defendant Schumacher's last name as "Schumaker," but it appears that her last name is correctly spelled as "Schumacher."

2

1    Plaintiff further alleges that Dr. Horowitz was deliberately indifferent to his serious

2  medical needs. Id. at 7. Plaintiff contends that, after his heart and chest surgeries, Dr. Horowitz

3  repeatedly eliminated or lowered the dosage of morphine tablets prescribed by other staff to control

4  his pain. Id. For example, Plaintiff asserts that Dr. Horowitz lowered a dosage of fifteen milligram

5  morphine tablets prescribed by a doctor more familiar with Plaintiff's case. Id. at 8. She allegedly

6  lowered the dose from three times a day for ninety days to twice a day for fourteen days. Id. But

7  Plaintiff remained in pain. Id. Yet, even though other providers prescribed morphine, Dr. Horowitz

8  continued to reduce or eliminate it. Id. At some point, Dr. Horowitz "interfered" with Plaintiff's

9  medical care by changing Plaintiff's prescription to methadone. Id. Another doctor changed the

10  methadone prescription back to morphine, but Dr. Horowitz again reduced the morphine. Id.

11  Plaintiff contends that Dr. Horowitz intentionally lowered the dose and knowingly disregarded his

12  severe, chronic pain. Id. at 7–8. Plaintiff, finally, asserts that methadone was inappropriate for

13  patients with a history of heart problems. Id. at 8. Another physician, Dr. Jackson, allegedly told

14  Plaintiff that methadone was inappropriate because of his history of heart complications. Id.

15                              **II. THE PARTIES' EVIDENCE**

16    **A.  Plaintiff's Noncompliance with Local Rule 260(b)**

17    Local Rule 260 requires motions for summary judgment to include a separate

18  Statement of Undisputed Facts. L.R. 260(a). Each Statement must enumerate each specific, material

19  fact relied upon in the motion and cite to any document—e.g., a deposition—establishing that fact.

20  Id. Parties opposing motions for summary judgment must reproduce the facts in the moving party's

21  Statement of Undisputed Facts and admit the facts that are undisputed and deny those that are

22  disputed. See L.R. 260(b). The opposing party must include with each denial a citation to any

23  document supporting the denial. Id. Opposing parties may also include concise Statements of

24  Disputed Facts encompassing all material facts over which there is a genuine dispute. Id.

25    Defendants properly included a Statement of Undisputed Facts alongside their

26  motion for summary judgment. ECF No. 49-1. Plaintiff, however, failed to properly reproduce

27  Defendants' Statement of Undisputed Facts admitting facts that are undisputed and denying those

28  that he contends are disputed. See ECF No. 64. Instead, Plaintiff submitted a list of undisputed

                                      3

1    "facts" reasserting his claims. ECF No. 64 at 7. Plaintiff does include with his opposition medical

2    records and a declaration laying out his version of events. See generally id.

3                Plaintiff is entitled to oppose Defendant's motion, and the Court considers his

4    opposition. The Court will also consider the documents attached to Plaintiff's opposition. But

5    Plaintiff has not complied with Rule 260(b). The Court deems Plaintiff to have admitted those facts

6    not disputed by his submissions. See, e.g., Fed. R. Civ. P. 56(e); Beard v. Banks, 548 U.S. 521, 527

7    (2006) ("[B]y failing specifically to challenge the facts identified in the defendant's statement of

8    undisputed facts, [plaintiff] is deemed to have admitted the validity of the facts contained in the

9    [defendant's] statement."); Brito v. Barr, No. 2:18-cv-00097-KJM-DB, 2020 WL 4003824, at *6

10   (E.D. Cal. July 15, 2020); see also Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004). In certain

11   instances, Plaintiff only disputes portions of an alleged undisputed fact. The Court deems admitted

12   those portions of facts that Plaintiff does not dispute.

13   **B.   Disputed and Undisputed Facts:[2]**

14                Defendants support their motion for summary judgment and statement of undisputed

15   facts with Plaintiff's medical records and the declarations of Nurse Schumacher, Dr. Rudas, and

16   Dr. Horowitz. ECF Nos. 49-2, 49-3, 49-4. On opposition, Plaintiff relies on his pleadings,

17   declaration, deposition, medical records, as well as declarations from Gregory Prestigiano and

18   Dennis Wayne Mize, Sr. ECF No. 64.

| Defendants' Statement | Plaintiff's Response |
|---|---|
| 1. Plaintiff David Patrick Alford was incarcerated by the California Department of Corrections and Rehabilitation ("CDCR") at Mule Creek State Prison ("MCSP") at all relevant times herein.<br><br>(Complaint p. 1, ⁋ 2.) | 1. Admit. |
| 2. During his incarceration with the CDCR, Plaintiff has been diagnosed with and treated for various medical conditions, including various heart conditions, a chest abscess, and sternal osteomyelitis.<br><br>(Complaint p. 5, ⁋ 3.) | 2. Admit. |

_____

[2] The Court may cite to the undisputed facts as "UDF." For example, UDF No. 1.

| | |
|---|---|
| 3. Mr. Alford underwent open heart surgery in August of 2013. Based upon the medical records, the surgical scar initially appeared to be healing well.<br><br>(Declaration of Rudas, ¶ 3, Ex. A; Deposition of David Alford, 12:19-22.) | 3. Admit. |
| 4. Mr. Alford testified at his deposition that his complaints regarding the chest abscess began in late May or early June of 2014. The first record of a complaint by Mr. Alford regarding an abscess at the site of the surgical scar is a Health Care Services Request form (CDC 7362) submitted by Mr. Alford on June 20, 2014. Mr. Alford was examined by Dr. Oliver Lau on June 24, 2014. Dr. Lau reported a well-healed surgical scar with no signs or symptoms of infection. Mr. Alford was advised to follow up as necessary.<br><br>(Declaration of Rudas, ¶ 4, Ex. A; Deposition of David Alford, 18:4-5, 20:11-14.) | 4. Partially admit. Plaintiff presented to Nurse J. Schumacher on June 20, 2014 for emergency treatment for the popped abscess on his chest. Nurse J. Schumacher refused to see Plaintiff and instructed him to file a CDRC Form 7362 Health Service Request Form. Plaintiff filed a request on June 20, 2014, and an appointment was set for June 24, 2014 where Dr. Oliver Lau examined Plaintiff.<br><br>(ECF No. 64 at 34, 58, Alford Decl. ¶4; ECF No. 20 at). |
| 5. Mr. Alford presented to Nurse J. Schumacher on June 28, 2014 with complaints of swelling in the center of his chest. Nurse Schumacher took Mr. Alford's vitals, notified the RN, and referred him to the Triage and Treatment Area (TTA) for further evaluation.<br><br>(Declaration of Rudas, ¶ 5, Ex. A; Declaration of Schumacher, ⊮ 3, Ex. A.) | 5. Admit. |
| 6. Mr. Alford was examined by the RN in the TTA on June 28, 2014 at 8:35 a.m. for complaints of a chest abscess. Mr. Alford stated that the chest abscess had started three weeks earlier. The abscess popped that morning at approximately 4:00 a.m. The RN examined, cleaned, and applied sterile dressing to the wound. The RN spoke with Nurse Practitioner L. Clark-Barlow by telephone. A ten-day course of antibiotics was prescribed, and Mr. Alford was scheduled for follow up evaluation and wound care.<br><br>(Declaration of Rudas, ¶ 6, Ex. A; Declaration of Schumacher, ⊮ 4, Ex. A.) | 6. Admit. |
| 7. Mr. Alford presented for wound care on June 29, 2014, June 30, 2014, and July 1, 2014. Mr. Alford reported a decrease in size of | 7. Admit. |

| | |
|---|---|
| the abscess. The wound was cleaned, and the dressing was changed on each occasion.<br><br>(Declaration of Rudas, ¶ 7, Ex. A.) | |
| 8. Nurse Practitioner L. Clark-Barlow examined Mr. Alford on July 11, 2014. Mr. Alford reported that he had finished his antibiotics, he had no complaints of pain, and no fever or chills. Nurse Practitioner Clark-Barlow concluded that the abscess had resolved and was healing well.<br><br>(Declaration of Rudas, ¶ 8, Ex. A.) | 8. Admit. |
| 9. Nurse Practitioner L. Clark-Barlow examined Mr. Alford again on July 29, 2014. At that time, Mr. Alford complained that the painful swelling had returned at the same site. Mr. Alford also complained of soreness in the sternum. Mr. Alford was referred to the TTA for an incision and drainage, with another course of antibiotics.<br><br>(Declaration of Rudas, ¶ 9, Ex. A.) | 9. Admit. |
| 10. Dr. Rudas examined Mr. Alford in the TTA on July 29, 2014 upon referral from Nurse Practitioner Clark-Barlow. Dr. Rudas completed the incision and drainage and sent a sample to the lab to test for infection. Dr. Rudas cleaned and packed the wound and prescribed another course of antibiotics. In light of Mr. Alford's surgical history, Dr. Rudas noted the possibility of sternal osteomyelitis. Dr. Rudas instructed Mr. Alford to return for a follow up appointment on August 4, 2014.<br><br>(Declaration of Rudas, ¶ 10, Ex. A.) | 10. Admit. |
| 11. Dr. Rudas next examined Mr. Alford on August 11, 2014. Dr. Rudas noted that the lab result had come back negative for any growth. Mr. Alford had just finished his second course of antibiotics and the incision had closed. However, Mr. Alford reported the abscess had re-formed in the same location on August 10, 2014. Dr. Rudas ordered X-rays of the chest which showed some "fuzziness" in the sternum.<br><br>(Declaration of Rudas, ¶ 11, Ex. A.) | 11. Admit. |

| | |
|---|---|
| 12. On August 12, 2014, Dr. Rudas contacted the surgeon at San Joaquin General Hospital, Dr. Mahmoud, to arrange for surgical follow up and treatment. Dr. Mahmoud requested a CT of the chest. Dr. Rudas ordered the CT, which was completed on August 13, 2014. The CT suggested possible sternal osteomyelitis. Dr. Rudas issued an order that Mr. Alford be transferred to San Joaquin General Hospital on August 14, 2014.<br><br>(Declaration of Rudas, ¶ 12, Ex. A.) | 12. Admit. |
| 13. Mr. Alford was examined at San Joaquin General Hospital, and ultimately underwent a partial sternectomy on August 22, 2014.<br><br>(Declaration of Rudas, ¶ 13, Ex. A.) | 13. Admit. |
| 14. Mr. Alford underwent a second sternectomy on October 17, 2014.<br><br>(Complaint p. 2, ₱ 1; Declaration of Rudas Ex. A.) | 14. Admit. |
| 15. The Medical Discharge Summary prepared by Dr. Steven Mo indicates that "His morphine sulfate was tapered down to 15 mg of extended release twice a day at the time of discharge. I recommend continued tapering of narcotic."<br><br>(Declaration of Horowitz, ¶ 3, Ex. A.) | 15. Admit. |
| 16. Morphine Sulfate is typically prescribed for postoperative pain. Morphine is considered a drug of abuse, and within the prison there was much talk about the crushing, smoking, and even injection of this chemical opioid. Both prison management and the medical community urged the alternate use of methadone, which was not as easily mutated for abuse.<br><br>(Declaration of Horowitz, ¶ 4, Ex. A.) | 16. Admit. |
| 17. Dr. Horowitz examined Mr. Alford on several occasions after his surgery and release from the hospital. At no point during any examination or review of his activities, did the patient appear to be in substantial pain. A progress note dated March 23, 2015 indicates that Mr. Alford reported pain at a 6/10, and | 17. Partially admit. Plaintiff denies that he was not in significant pain but does not otherwise challenge the allegations.<br><br>(E.g., Alford Dep. 33:14-39:13; ECF No. 20 at 8; ECF No. 64 at 61, Alford Decl. ¶ 26) |

| | |
|---|---|
| that his pain was "getting better." Another progress note dated April 9, 2015 indicates that Mr. Alford denied pain at that time.<br><br>(Declaration of Horowitz, ¶ 5, Ex. A.) | |
| 18. Following Mr. Alford's hospitalization and procedures, Dr. Horowitz converted the Morphine Sulfate dosage to the exact equivalent of methadone – 15 mg of Morphine Sulfate converts to 5mg of methadone. Thus, the pain medication was not tapered or lowered; it was changed to an alternate formulation.<br><br>(Declaration of Horowitz, ¶ 6, Ex. A.) | 18. Partially admit. Plaintiff admits that Dr. Horowitz prescribed methadone. But Plaintiff also contends that Dr. Horowitz reduced or canceled Plaintiff's pain prescriptions on multiple occasions.<br><br>(E.g., Alford Dep. 34:13–35:15; ECF No Alford Decl. ¶ 19-33, Ex. G.) |
| 19. Dr. Horowitz's decision to transition Mr. Alford from Morphine Sulfate to methadone was consistent with the medical discharge summary and the community standard of care.<br><br>(Declaration of Horowitz, ¶ 7, Ex. A.) | 19. Admit. |

### III. STANDARD OF REVIEW

Summary judgment is warranted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Washington Mutual Inc. v. United States, 636 F.3d 1207, 1216 (9th Cir. 2011). A fact is material if it might affect the outcome of the lawsuit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, an issue of material fact is genuine only if there is sufficient evidence for a reasonable factfinder to find for the non-moving party. E.g. id. On motion for summary judgment, the Court determines only whether there is a genuine issue for trial. Thomas v. Ponder, 611 F3d 1144, 1149–50 (9th Cir. 2010). In so doing, the Court must liberally construe a pro se prisoner plaintiff's filings. Id. at 1150.

Federal Rule of Civil Procedure 56 permits courts to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to an entire claim or a portion of a claim. See Fed. R. Civ. P. 56(a); Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3

1  (9th Cir. 1981); Smith v. Cal. Dep't of Highway Patrol, 75 F. Supp. 3d 1173, 1179 (N.D. Cal. 2014).

2  The same standards apply on motion for summary judgment and for summary adjudication. See

3  Fed. R. Civ. P. 56 (a), (c); Mora v. Chem-Tronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

4          Summary judgment should be entered "after adequate time for discovery and upon

5  motion, against a party who fails to make a showing sufficient to establish the existence of an

6  element essential to that party's case, and on which that party will bear the burden of proof at trial."

7  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the "initial

8  responsibility" of demonstrating the absence of a genuine issue of material fact. Id. at 323. A party

9  demonstrates that summary judgment is appropriate by "informing the district court of the basis of

10  its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

11  and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence

12  of a genuine issue of material fact." Id. at 323 (quoting Fed. R. Civ. P. 56(c)). On an issue for which

13  the nonmoving party will have the burden of proof at trial, the moving party need only point out

14  "an absence of evidence to support the nonmoving party's case." Id. at 325. A moving party may

15  also produce evidence negating an essential element of the nonmoving party's claim or defense.

16  E.g., Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

17          If the moving party meets its initial burden, the burden shifts to the opposing party

18  to present specific facts showing a genuine issue of a material fact. See Fed R. Civ. P. 56(e);

19  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). An opposing party,

20  however, "must do more than simply show that there is some metaphysical doubt as to the material

21  facts." Matsushita, 475 U.S. at 587. The "mere existence of some alleged factual dispute between

22  the parties will not defeat an otherwise properly supported motion for summary judgment; the

23  requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247–48. An

24  issue of fact is a genuine issue if it reasonably can be resolved the non-moving party's favor. Fresno

25  Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014).

26          In this regard, the opposing party must move beyond the pleadings through citations

27  to the record—such as citations to affidavits, depositions, and admissions—designate specific facts

28  establishing a genuine issue for trial. Celotex, 477 U.S. at 324. The opposing party must "show

1    more than the mere existence of a scintilla of evidence." <u>Anderson</u>, 477 U.S. at 252. A non-moving

2    party, however, is not required to establish a material issue of fact conclusively in its favor; it is

3    sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

4    differing versions of the truth at trial." <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc.</u>,

5    809 F.2d 626, 630 (9th Cir. 1987). Still, "failure of proof concerning an essential element of the

6    nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323.

7              The Court may consider other materials in the record not cited to by the parties, but

8    it is not required to do so. <u>See</u> Fed. R. Civ. P. 56(c)(3); <u>Carmen v. San Francisco Unified Sch. Dist.</u>,

9    237 F.3d 1026, 1031 (9th Cir. 2001); <u>see also</u> <u>Simmons v. Navajo County, Ariz.</u>, 609 F.3d 1011,

10   1017 (9th Cir. 2010). The Court need not scour the record to establish an absence or presence of

11   factual disputes when the evidence is not adequately set forth in opposing papers. <u>See, e.g.</u>, <u>Carmen</u>,

12   237 F.3d at 1031. The Court, furthermore, cannot engage in determinations of credibility or

13   weighing of evidence. <u>Manley v. Rowley</u>, 847 F.3d 705, 711 (9th Cir. 2017). Nevertheless, the

14   evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable

15   inferences" must be drawn in that party's favor. <u>E.g.</u>, <u>Anderson</u>, 477 U.S. at 255; <u>Fresno Motors</u>,

16   771 F.3d at 1125. Summary judgment is inappropriate when divergent ultimate inferences may

17   reasonably be drawn from the undisputed facts. <u>Fresno Motors</u>, 771 F.3d at 1125.

18                                          **IV. DISCUSSION**

19             Defendants argue that Plaintiff has failed to present any genuine dispute of material

20   fact regarding his Eighth Amendment claims and that no Defendant was deliberately indifferent to

21   Plaintiff's serious medical needs. The Court agrees.

22   **A.  Deliberate Indifference to Serious Medical Needs:**

23             To establish an Eighth Amendment claim based on prison medical treatment, an

24   inmate must show a deliberate indifference to a serious medical need. <u>Jett v. Penner</u>, 439 F.3d 1091,

25   1096 (9th Cir. 2006) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)); <u>Hallett v. Morgan</u>, 296

26   F.3d 732, 744 (9th Cir. 2002). A plaintiff must show (1) an objective "serious medical need" by

27   demonstrating that "failure to treat a prisoner's condition could result in further significant injury

28   or the 'unnecessary and wanton infliction of pain'" and (2) that a defendant's response to the serious

1    medical need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith,

2    974 F.2d 1050, 1059–60 (9th Cir. 1992)) (citation and internal quotations marks omitted), overruled

3    on other grounds by WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see

4    Colwell v. Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014). Denial *or* delay of medical care may

5    constitute a constitutional violation. Estelle, 429 U.S. at 104–05. Intentional interference with an

6    inmate's medical care may also constitute deliberate indifference. E.g., Jett, 439 F.3d at 1091.

7            Deliberate indifference exists if a defendant *subjectively* "knows of and disregards

8    an excessive risk to inmate health and safety." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir.

9    2004) (emphasis added) (citation and internal quotation marks omitted). The question of deliberate

10   indifference focuses on what a defendant's mental attitude actually was. Farmer v. Brennan, 511

11   U.S. 825, 835–37 (1994). A prison official must have had a sufficiently culpable state of mind. Id.

12   at 834. Deliberate indifference can be established by showing (a) a purposeful act or failure to

13   respond to a prisoner's pain or medical needs and (b) harm caused by the indifference." Jett, 439

14   F.3d at 1096 (citation omitted). Negligent medical care is not a constitutional violation. Frost v.

15   Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998) (citing Estelle, 429 U.S. at 105–06); see also Farmer,

16   511 U.S. 825, 835–37. "Medical malpractice does not become a constitutional violation merely

17   because the victim is a prisoner." Estelle, 429 U.S. at 106.

18           A difference of opinion between an inmate and prison medical staff about the proper

19   course of medical treatment is not deliberate indifference. See, e.g., Toguchi, 391 F.3d at 1058;

20   Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Nor is a dispute between an inmate and prison

21   officials over the necessity or extent of medical treatment. See, e.g., Toguchi, 391 F.3d at 1058;

22   Sanchez, 891 F.2d at 242; see also, e.g., Hendon v. Ramsey, 528 F.Supp.2d 1058, 1065 (N.D. Cal.

23   2007). To establish that a difference of opinion rose to the level of deliberate indifference, an inmate

24   "must show that the course of treatment the doctors chose was medically unacceptable under the

25   circumstances." Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

26   Inmates must show that a medical provider chose a course of treatment in conscious disregard of

27   an excessive risk to the inmate's health. See Jackson, 90 F.3d at 332.

28   ///

**B.  Nurse Schumacher:**

Plaintiff contends that Nurse Schumacher at least twice refused him treatment, sometime in May and again on June 20, 2014. See ECF Nos. 20 at 9; 64 at 58–59. Schumacher allegedly knew about a serious medical need on both occasions, specifically the open, leaking abscess in Plaintiff's chest that would endanger his health if not treated. ECF Nos. 20 at 9; 64 at 58–59. Defendants argue that Schumacher was not deliberately indifferent to Plaintiff's serious medical needs. ECF No. 49 at 10. Defendants specifically contend that Plaintiff has failed to present evidence that Schumacher disregarded Plaintiff's medical needs. Id. at 10. The Court agrees.

Most of the facts regarding Plaintiff's initial attempts to receive treatment for the abscess in his chest are undisputed. Plaintiff filed a healthcare services request on June 20, 2014. UDF No. 4; ECF No. 64 at 34, 59. Dr. Oliver Lau saw Plaintiff a few days later on June 24, 2014, but found no infection. UDF No. 4. Dr. Lau told Plaintiff to follow up as needed. Id. Plaintiff again sought treatment for the abscess on June 28, 2014. UDF No. 4; ECF No. 64 at 59. Nurse Schumacher took Plaintiff's vitals, notified an RN, and referred him to the TTA for evaluations. UDF No. 5; ECF No. 64 at 59.

Defendants contend that the June 20, 2014, request is the earliest record of Plaintiff seeking treatment, the implication being that Plaintiff cannot show that he sought treatment from Schumacher before then. See ECF No. 49 at 3, 10. Plaintiff, however, contends that he sought treatment in May 2014, and that Schumacher sent him away.[3] ECF No. 20 at 9; Alford Dep. 17:25–18:5. He alleges that Schumacher told him to leave the clinic and that she would not examine him or place treatment order. ECF No. 20 at 9. But Plaintiff submits nothing, other than his claims, to show that he requested treatment earlier than June 20, 2014, let alone that Schumacher sent him away knowing of a serious wound in his chest. See generally, e.g., ECF No. 64.

As to the claim that Schumacher turned him away sometime in May 2014, Defendants have thus shown an absence of evidence that Schumacher knew of any serious medical

---

[3] Plaintiff's complaint alleges that Schumacher denied him care in May 2014. ECF No. 20 at 9. Plaintiff's opposition, however, does not directly state that Schumacher turned him away in May 2014, instead indicating that the first time he met with Schumacher was July 20, 2015. ECF No. 64 at 58–59. His opposition does indicate "medical staff" turned him away in May 2014. Id. at 4.

12

1    need prior to June 20, 2014. They have thus borne their initial burden of showing the absence of

2    evidence supporting an essential element of Plaintiff's claim and on which Plaintiff bears the

3    burden of proof at trial. See, e.g., Celotex, 477 U.S. at 322–25; see also Jones v. Williams, 791 F.3d

4    1023, 1030–31 (9th Cir. 2015) (stating that a moving party must produce evidence negating an

5    essential element of a nonmoving party's claim or show that the nonmoving party lacks sufficient

6    evidence of an essential element to carry the burden of persuasion at trial). That is to say, with

7    respect to any Eighth Amendment claim arising from conduct prior to June 20, 2014, Defendants

8    have shown that Plaintiff lacks evidence showing that Schumacher had *subjective* knowledge of a

9    serious medical need. See Toguchi, 391 F.3d at 1057.

10           The burden accordingly shifts to Plaintiff to establish a genuine dispute over whether

11   he sought treatment from Schumacher in May 2014 and whether she knowingly disregarded a

12   serious risk to his health or safety. See Matsushita, 475 U.S. at 586–87. But Plaintiff must move

13   beyond his pleadings. Celotex, 477 U.S. at 324. He must show more than a scintilla of evidence.

14   Anderson, 477 U.S. at 252. Insofar as the pre-June 2014 claims go, Plaintiff has not done so. He

15   simply rests upon the complaint and his allegations. ECF Nos. 20 at 9–10; 64 at 4, 58–59. That is

16   insufficient and his claims against Schumacher for allegedly refusing treatment around May 2014

17   cannot survive summary judgment.

18           For the same reasons, Plaintiff's claims arising specifically from June 20, 2014, also

19   do not survive. Defendants contend that the first time Schumacher saw Plaintiff was on June 28,

20   2014. See UDF No. 5; ECF NO. 49 at 4, 10. As support, Defendants submit Schumacher's notes

21   from June 28, 2014, which indicate that Schumacher checked Plaintiff's vitals (e.g., temperature

22   and blood pressure), notified the RN, and referred Plaintiff to the Triage and Treatment Area. ECF

23   No. ECF No. 49-3, Schumacher Decl., Ex. A.

24           Plaintiff contends that Schumacher turned him away, knowing of his pain and injury,

25   on June 20, 2014. ECF Nos. 20 at 9–10; 64 at 58–59. But other than citing to his healthcare request

26   from that date (which does not mention Schumacher), he offers no evidence other than his

27   allegations contradicting Defendants' alleged undisputed facts. E.g., ECF No. 64 at 34, 58–59. Even

28   construing, as the Court must, Plaintiff's pro se filings, Defendants have carried their initial burden

1    of establishing the absence of evidence showing that Schumacher knew of and disregarded a serious

2    risk to Plaintiff's health on June 20, 2014. Resting upon the allegations (and standalone citation to

3    the request) as he does, Plaintiff fails to sufficiently move beyond his pleadings or show more than

4    a scintilla of evidence establishing that Schumacher even knew of Plaintiff's condition on June 20,

5    2014. See Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 252; Matsushita, 475 U.S. at 586–87.

6             Although it is unclear whether he does, to the extent that Plaintiff asserts claims

7    against Schumacher for claims arising after June 20, 2014—i.e., June 28, 2014—those claims must

8    fail too. On June 28, 2014, Schumacher checked Plaintiff's vitals, summoned the RN, and referred

9    Plaintiff to the TTA. UDF No. 5; ECF No. ECF No. 49-3, Schumacher Decl., Ex. A. Schumacher

10   subjectively knew of Plaintiff's abscess and risk to his health on June 28, 2014. See, e.g., id. But

11   she did not disregard that risk.[4] See, e.g., id.; see also Toguchi, 391 F.3d at 1057.

12            The undersigned recommends summary judgment be granted in Defendants' favor

13   as to Plaintiff's claims against Nurse Schumacher.

14   **C. Dr. Rudas:**

15            Defendants argue there is no genuine dispute of material fact over Dr. Rudas'

16   actions, and that Plaintiff's Eighth Amendment claims fail. ECF No. 49 at 8. The Court agrees.

17            Plaintiff claims that Dr. Rudas delayed addressing the abscess that developed on

18   Plaintiff's chest after Plaintiff underwent open-heart surgery. ECF No. 20 at 5. Plaintiff alleges that

19   the abscess presented in August 2013. Id. Plaintiff does not dispute that first met with Dr. Rudas

20   on July 29, 2014. UDF No. 9; Alford Dep. 25:22–26:17, 30:9-15, 32:2-7; see ECF No. 20 at 5. Dr.

21   Rudas did not diagnose Plaintiff with sternal osteomyelitis on July 29, 2014. UDF No. 10; see

22   Alford Dep. 26:5–17. Rather, Dr. Rudas took a sample from the drainage from the abscess on

23   Plaintiff's chest and sent it for lab testing. UDF No. 10; ECF No. 49-4, Rudas Decl., Ex. A. He also

24   cleaned the wound and prescribed antibiotics. UDF No. 10; ECF No. 49-4, Rudas Decl., Ex. A.

25            Dr. Rudas had initially instructed Plaintiff to return on August 4, 2014, but

26   ultimately next examined him on August 11, 2014. UDF Nos. 10–11; ECF No. 49-4, Rudas Decl.,

27   _____

[4] Indeed, as Defendants' Statement of Undisputed Facts indicates, as a result of Schumacher's notifying the RN of Plaintiff's condition, the RN examined Plaintiff a half an hour later. UDF Nos. 5–6. He also received antibiotics and
28   follow up treatment over the next several days. E.g., UDF Nos. 6–9.

1   Ex. A. Dr. Rudas noted that the lab came back negative for growth. UDF No. 11. But because

2   Plaintiff's abscess persisted, Dr. Rudas ordered X-rays of Plaintiff's chest, which showed

3   "fuzziness." Id. After consulting with a surgeon at San Joaquin general hospital to arrange for

4   surgical follow up and treatment for Plaintiff, at the request of the surgeon Dr. Rudas ordered a CT

5   scan, which was completed on August 13, 2014. UDF No. 12. The CT scan suggested osteomyelitis.

6   Id. Thereafter, Plaintiff received treatment at San Joaquin general hospital. UDF No.  13.

7         Given that the parties agree on the substance of Dr. Rudas' actions, there is no

8   genuine dispute as to any material fact concerning Dr. Rudas' conduct. See, e.g., Fresno Motors,

9   771 F.3d at 1125. Defendants have met their initial burden. The burden thus shifts to Plaintiff to

10   present specific facts showing a genuine issue necessitating resolution at trial. Celotex, 477 U.S. at

11   324; Matsushita, 475 U.S. at 587. He has not done so.

12         The question for the Court is whether Dr. Rudas acted unconstitutionally. He did

13   not. Plaintiff fails in the claims that Dr. Rudas unconstitutionally failed to treat Plaintiff's chest

14   abscess, resulting in osteomyelitis. Undisputed evidence shows that, when Plaintiff first met with

15   Dr. Rudas on July 29, 2014, Dr. Rudas took a sample for testing, cleaned the wound, and prescribed

16   antibiotics. UDF No. 10; ECF No. 49-4, Rudas Decl., Ex. A. Dr. Rudas followed up with Plaintiff

17   on August 11, 2014, ordered X-rays, ordered a CT scan, and referred Plaintiff to the hospital when

18   Plaintiff tested positive for osteomyelitis. UDF Nos. 11–12.

19         Nothing indicates that Dr. Rudas subjectively knew of Plaintiff's osteomyelitis

20   beforehand and disregarded it. Thus, Dr. Rudas cannot have been deliberately indifferent. Jett, 439

21   F.3d at 1096; Toguchi, 391 F.3d at 1057. To the extent that Dr. Rudas *should* have known of

22   Plaintiff's osteomyelitis and did not diagnose it, causing further harm, Dr. Rudas was at most

23   negligent. See, e.g., Toguchi, 391 F.3d at 1057, 1059–61. Negligence does not establish an Eighth

24   Amendment violation. Lemire v. California Dept. of Corrections and Rehabilitation, 726 F.3d 1062,

25   1084 (9th Cir. 2013); Toguchi, 391 F.3d at 1057, 1059–61. "Medical malpractice does not become

26   a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106.

27         For the reasons above, the undersigned recommends that summary judgment be

28   granted in favor of Defendants as to Plaintiff's claims against Dr. Rudas.

**D. Dr. Horowitz:**

Defendants argue that Dr. Horowitz' reduction of Plaintiff's pain medication is insufficient to support a claim for deliberate indifference. ECF No. 49 at 10. Plaintiff replies, but largely rehashes his claims that Dr. Horowitz knowingly caused him pain by impermissibly altering his prescriptions even though she knew doing so would cause pain. See, e.g., ECF NO. 64 at 60.

The Court agrees with Defendants. As discussed below, Plaintiff raises some disputes of fact. But they are ultimately immaterial or insufficient to survive summary judgment. Defendants have carried their burden of showing the absence of a genuine dispute of material fact.

Plaintiff's submissions do not dispute the following facts. A physician who discharged Plaintiff after his October 2014 sternectomy prescribed morphine. UDF No. 15. The physician recommended tapering of the morphine. Id. Dr. Horowitz examined Plaintiff soon thereafter. UDF Nos. 15–17.[5] Over the course of her continued treatment of Plaintiff, he did not appear to be in significant pain. UDF No. 17. Progress notes indicate that Plaintiff reported a pain level of six out of ten, that his pain was improving, and later denied being in significant pain. Id. Dr. Horowitz, in adjusting Plaintiff's pain medication, prescribed methadone. UDF No. 18; Alford Dep. 35:1–5; see, e.g., ECF No. 20 at 8. In doing so, Dr. Horowitz only altered the formulation[6] of Plaintiff's medication by giving him a dosage of methadone equivalent to his numerically higher dose of morphine. See UDF No. 18. Dr. Horowitz's decision to transition Plaintiff from morphine to methadone was consistent with the recommendation of physician who discharged Plaintiff after his surgery, and with accepted standards of care. UDF No. 19.

Nevertheless, Plaintiff raises some disputes. First, Plaintiff broadly states that he remained in pain, but he does not directly dispute the individual progress notes or his statements within them. See ECF Nos. 20 at 7–8; 64 at 60–62; see also, e.g., Alford Dep. 34:13–35:15. Nor does he submit anything (other than his allegations) showing that Dr. Horowitz subjectively knew of enduring pain despite her prescription of methadone. See ECF No. 64; see also ECF No. 20.

---

[5] The Court notes that Plaintiff only disputes portions of Defendants alleged undisputed facts numbers sixteen and seventeen, and he does not deny that Dr. Horowitz examined him after he left the hospital in October 2014.

[6] Plaintiff impliedly disputes, on some level, the description of Dr. Hortwitz's actions as only altering the formulation of his medication, but as explained below the effect is the same and the underlying conduct is undisputed.

16

1    Second, Plaintiff does seem to take issue with the description of Dr. Horowitz's

2    alteration of his medication. Plaintiff contends that Dr. Horowitz arbitrarily reduced, canceled, and

3    eliminated other pain medication (e.g., morphine) that other healthcare providers prescribed. See

4    ECF Nos. 20 at 7–8; 64 at 60–62, 66; see also, e.g., Alford Dep. 34:13–35:16. Defendants contend

5    that Dr. Horowitz did not "lower" or "taper" Plaintiff's pain medication, only adjusted the

6    formulation by prescribing a comparable dose of methadone. UDF No. 18. The Court recognizes

7    there is a difference in adjusting formulation of a medication and simply reducing it, but for the

8    purposes of this case any dispute as to terminology is immaterial. The parties agree over Dr.

9    Horowitz's core actions. She adjusted Plaintiff's morphine and prescribed methadone.[7] UDF No.

10   18–19; ECF Nos. 20 at 7–8; 64 at 60–62, 66; see also, e.g., Alford Dep. 34:13–35:16.

11   Third, Plaintiff contends that methadone was inappropriate because he had heart

12   problems, and methadone is contraindicated for cardiac patients. ECF Nos. 20 at 8; 64 at 62, 66;

13   Alford Dep. 35:1–13. Plaintiff asserts that Dr. Jackson, another physician who treated him, told

14   him methadone was inappropriate because of his history of heart complications. E.g., ECF Nos. 20

15   at 8; 64 at 62; Alford Dep. 35:1–13. Plaintiff, on opposition, cites to an exhibit in support of Dr.

16   Jackson's alleged statement, but neither his citation nor record appears to show that methadone was

17   inappropriate because of Plaintiff's history of heart-related complications. See generally ECF No.

18   64. Plaintiff's submissions do contain a document from Dr. Jackson requesting a cardiology referral

19   for Plaintiff in 2018, but it does not mention anything about Dr. Horowitz's prescription of

20   methadone or methadone's inappropriateness. ECF No. 64 at 49. The Court will not scour the

21   record searching for evidence to establish the presence of a factual dispute over whether methadone

22   was an appropriate prescription for Plaintiff when he has not adequately set it forth in opposing

23   papers. See, e.g., Carmen, 237 F.3d at 1031. The Court will not litigate Plaintiff's case for him.

24   ///

25

26   [7] It appears to the Court, based on medical records and Plaintiff's testimony during his deposition, that Dr. Horowitz *did* reduce or taper the morphine while also prescribing methadone. See Alford Dep. 34:13–35:16; ECF No. 49-3,
27   Horowitz Decl., Ex. A at 7, 14; ECF No. 64 at 60–62, 66, 80, 83. Indeed, Dr. Horowitz herself mentions tapering Plaintiff's morphine. ECF No. 64 at 80. In any event, however, as the Court discusses, Dr. Horowitz's treatment raises
28   only a difference of opinion with Plaintiff, so although the fact is relevant, it does not alter the resolution of the case or the material substance of her actions in adjusting medications.

17

1    Plaintiff has not met the burden that shifted to him. Defendants have established that

2    there is no dispute as to any material fact going to Dr. Horowitz's actions and subjective knowledge.

3    Plaintiff has offered nothing except his allegations in return. He broadly concludes that Dr.

4    Horowitz reduced, cancelled, and interfered with his medication *knowing* that it would cause him

5    pain. ECF Nos. 20 at 7–8; 64 at 61–62, 66. And other than stating, without apparent support, that

6    methadone was inappropriate, he does not otherwise expand into specifics on how Dr. Horowitz's

7    treatment was subpar. Such conclusory allegations are insufficient to defeat summary judgment.

8    Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); Taylor, 880 F.2d at 1045.

9    He has not, as is required, shown Dr. Horowitz had *subjective* knowledge of and disregarded a

10   serious medical need. See, e.g., Toguchi, 391 F.3d at 1057. At most, Plaintiff has established some

11   metaphysical doubt as to Dr. Horowitz's knowledge of Plaintiff's lasting pain and the

12   appropriateness of her selected course of treatment.

13   Inasmuch as Plaintiff contends that Dr. Horowitz's chosen treatment was medically

14   unacceptable under the relevant circumstances (see ECF Nos. 20 at 7–8; 64 at 61–62, 66), Plaintiff

15   merely argues over a difference of opinion with Dr. Horowitz. Plaintiff apparently desired

16   continued prescription of morphine, and Dr. Horowitz ostensibly believed it was inappropriate. See

17   ECF Nos. 20 at 7–8; 64 at 61–62, 66; see also UDFs 15–19. Differences of opinion between

18   Plaintiff and Dr. Horowitz do not establish deliberate indifference. See, e.g., Toguchi, 391 F.3d at

19   1058; Sanchez, 891 F.2d at 242; Hendon, 528 F.Supp.2d at 1065.  Nor does any disagreement with

20   Dr. Horowitz over the extent of medical treatment. See, e.g., Toguchi, 391 F.3d at 1058; Sanchez,

21   891 F.2d at 242; Hendon, 528 F.Supp.2d at 1065. To establish that his differences with Dr.

22   Horowitz rose to deliberate difference, Plaintiff must show that Dr. Horowitz's chosen course of

23   treatment was medically unacceptable under the circumstances. Toguchi, 391 F.3d at 1058;

24   Jackson, 90 F.3d at 332. Inmates must show that a medical provider chose a treatment in conscious

25   disregard of an excessive risk to the inmate's health. See Jackson, 90 F.3d at 332.

26   Outside of baldly stating that Dr. Horowitz's treatment was inappropriate because

27   methadone is contraindicated for Patient's with a history of heart complications, Plaintiff has not

28   forwarded any medical evidence that Dr. Horowitz' treatment was inappropriate. See ECF Nos. 20

18

1    at 7–8; 64 at 61–62, 66. That is insufficient to establish that Dr. Horowitz's care was medically

2    unacceptable. There is presently no basis on the record to conclude that Dr. Horowitz's care was

3    medically improper, let alone chosen in conscious disregard of a risk to Plaintiff's safety. And

4    although Plaintiff claims that he remained in at least some pain after Dr. Horowitz's treatment, even

5    if Dr. Horowitz' had some knowledge, that claim alone does not establish a deprivation of

6    constitutional dimensions. Dr. Horowitz certainly could not just knowingly leave Plaintiff in

7    anguish. See, e.g., Toguchi, 391 F.3d at 1057. But Dr. Horowitz cannot be held liable if she

8    responded reasonably to Plaintiff's pain, even if harm was not completely averted. See, e.g.,

9    Farmer, 511 U.S. at 845. Too, Plaintiff is obviously entitled to reasonable care, but he is not entitled

10   to a specific type of treatment or even the best available care. E.g., Forbes v. Edgar, 112 F.3d 262,

11   266–67 (7th Cir. 1997); Thornberry v. Chau, No. 2:18-cv-0094-WBS-EFB P, 2019 WL 3302404,

12   at *2–3 (E.D. Cal. July 23, 2019); see also Toguchi, 391 F.3d at 1058 (holding that a doctor was

13   not deliberately indifferent for prescribing an inmate alternative medication).

14           Assuming, for the sake of argument, that methadone was ultimately inappropriate,

15   without a conscious disregard for Plaintiff's safety on Dr. Horowitz's part, Plaintiff has at most

16   established that Dr. Horowitz was negligent. See, e.g., Toguchi, 391 F.3d at 1059–60. Negligence

17   does not establish an Eighth Amendment violation. Lemire v. California Dept. of Corrections and

18   Rehabilitation, 726 F.3d 1062, 1084 (9th Cir. 2013); Toguchi, 391 F.3d at 1057, 1059–61. Even if

19   Dr. Horowitz committed medical malpractice in prescribing methadone, that malpractice does not

20   become a constitutional deprivation just because Plaintiff is a prisoner. See Estelle, 429 U.S. at 106.

21           Because she was not deliberately indifferent to Plaintiff's serious medical needs, the

22   undersigned recommends granting summary judgment in favor of Dr. Horowitz.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

19

1

**V. CONCLUSION**

2          In the light of the foregoing, the undersigned Untied States Magistrate Judge

3   recommends that Defendants' motion for summary judgment (ECF No. 49) be **GRANTED**.

4          These findings and recommendations are submitted to the United States District

5   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after

6   being served with these findings and recommendations, any party may file written objections with

7   the court. Responses to objections shall be filed within 14 days after service of objections. Failure

8   to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951

9   F.2d 1153 (9th Cir. 1991).

10

11   Dated:  March 25, 2021

12                                                    _____
                                                     DENNIS M. COTA
13                                                   UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28